[No. S004613. Crim. No. 23630. Dec. 7, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WAYNE HUNTER, Defendant and Appellant.

## Counsel

Frank O. Bell, Jr., and Harvey R. Zall, State Public Defenders, under appointment by the Supreme Court, Roy M. Dahlberg, Deputy State Public Defender, and Cynthia A. Thomas for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette and Gerald A. Engler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUFMAN, J.—Michael Wayne Hunter appeals (Pen. Code, § 1239, subd. (b))[1] from a judgment of death following his conviction of the murders (§ 187) of Jay and Ruth Hunter. The jury also found true the allegation that defendant had personally used a firearm in the commission of the murders (§ 12022.5), and the special circumstance allegation that defendant was convicted, in this proceeding, of more than one murder. (§ 190.2, subd. (a)(3).) Having found no error warranting reversal of the guilt or penalty phase verdicts, we affirm the judgment in its entirety.

## I.

### FACTS

#### A. *Prosecution Case*

On the evening of December 28, 1981, Jay and Ruth Hunter, defendant's father and stepmother, were shot to death in the bedroom of their home in Pacifica. The events surrounding their death, as revealed through the evidence and testimony at trial, were as follows.

In November 1981, about a month before the homicides, defendant told his friend, Thomas Henkemeyer, of plans to kill his father and stepmother. According to Henkemeyer, defendant laid out several scenarios for possible alibis, including taking out a hiking permit in Yosemite National Park and then returning to commit the murders, or going down to San Diego where friends would purportedly provide an alibi. Based on earlier conversations with defendant, Henkemeyer concluded that defendant's motive for the planned killings was to take "revenge" for a number of perceived grievances; these included an incident in which his stepmother had reported defendant for breaking into his parents' home while they were away on vacation, and his stepmother's handling of his natural mother's will, which defendant believed resulted in his being cheated of his inheritance. Defend-

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

ant also discussed possible methods of transporting and concealing a rifle or shotgun.

Several weeks later, between December 12th and 14th, defendant brought a shotgun and shells to Henkemeyer's residence in Sacramento. Defendant told Henkemeyer that he planned to use the shotgun to kill his parents during the spring or summer of 1982. Defendant left the shotgun and shells with Henkemeyer.

Shortly thereafter, on December 20th, Henkemeyer left Sacramento to spend the Christmas holidays with his family in Minnesota. Before he left, he drove his car, a brown Toyota Corolla, to defendant's house in Mountain View for safekeeping. He gave defendant the keys to the car and the keys to his residence in Sacramento.

About a week later, on the evening of December 28th, a neighbor of Jay and Ruth Hunter was awakened by a loud "bang or shot" from the direction of the Hunter residence. He heard four more shots in quick succession. On or about the same evening in late December, Philip Eldred was walking two dogs a short distance from the Hunter residence when he encountered a man wearing a leather jacket and a motorcycle helmet. For no apparent reason the man told Eldred to leave the area. Eldred refused. In response, the man pointed a long object (which Eldred then realized was a shotgun) at Eldred's face, kicked him in the thigh and retreated behind a cyclone fence several feet away. He then fired a shotgun blast in Eldred's direction, entered a small, burgundy-colored car parked nearby, and drove away. Eldred stated that the man appeared to be in his early 20's and of medium build. Defendant was 23 at the time of the offenses.

Later the same evening, defendant's roommate, Jeffrey Hansen, was watching television when defendant walked through the front door. According to Hansen, defendant immediately showed him his left arm, which was cut between the wrist and elbow, and explained that he had tripped on the front porch, dropped a six-pack of beer and cut himself.

The bodies of Jay and Ruth Hunter were discovered the following day, December 29, 1981, after the police were alerted that the front door of the residence was wide open and a window on the side of the door was broken out. The police found both bodies in the master bedroom. The body of Jay Hunter was on the bed; that of Ruth Hunter was lying against the far wall, on top of the telephone receiver. Eight expended shotgun casings were found on the floor. Autopsies revealed that Ruth Hunter had died of two shotgun wounds to the head, either of which was sufficient to cause death. Jay Hunter had suffered four shotgun wounds. One shot to the upper chest

that had apparently caused death was fired from a distance. Three other shots, to the neck, abdomen and left knee, had been fired from much closer range and were consistent with having been inflicted where the victim lay.

During the next several days, Henkemeyer, still in Minnesota visiting his family, received two telephone calls from defendant. In the first call defendant told Henkemeyer that he had killed his mother and father and was trying to decide what to do. During the second call, a day or two later, defendant said that he had spoken with a lawyer and was preparing to leave the country. He also indicated that he had been seen by a stranger after the killings but doubted that an identification could be made because he was wearing a helmet. When Henkemeyer returned home to Sacramento on New Year's Day, he found that the shotgun defendant had left was missing.

Around the same time period defendant also spoke with his friend Jefferson Schar. Defendant told Schar that his parents had been killed and that he had "a lot to do with it." Defendant told Schar, however, that he had merely accompanied another, unidentified man who had actually committed the murders. Defendant described to Schar the events immediately preceding the shooting. He said that he had entered the house, awakened his father and told him that his entry proved he could "get to [him] at any time." His father responded: "You don't have the balls enough to do anything of that nature." Defendant became angered and told the unidentified gunman to "go ahead and shoot him." The gunman complied. His mother awakened, said, "No, Mike, don't," and the gunman shot her too.

The day after his conversation with Schar, defendant told Henkemeyer that he was trying to leave the country and asked him to sell some of his belongings. At defendant's request, Schar drove defendant to San Jose airport. On the way, defendant stopped at a barbershop and had his beard and moustache shaved off. Defendant asked Schar to obtain a phony birth certificate for him under the name John Dunne. At the airport defendant purchased a ticket to San Diego under a false name. While waiting for the flight, defendant again told Schar that he was involved in the killings but was not the shooter. He explained that after the incident he had disposed of the murder weapon by breaking it into pieces and throwing it into the bay. Defendant said that he planned to contact a friend named Jeffrey Luther in San Diego and instructed Schar to forward the phony birth certificate to him there.

Luther received a telephone call from defendant on January 3, 1982. The two arranged to meet at a restaurant in San Ysidro, near the Mexican border. At the restaurant, defendant told Luther that he was "wanted for murder" and explained the circumstances of the shootings. Defendant said

that he had entered his parents home carrying a shotgun and wearing a motorcycle helmet. He confronted his father and threatened to shoot him. His father responded, "[Y]ou don't have the balls." In response, defendant told Luther, he "pumped four slugs into him."

Following the conversation in San Ysidro, Luther saw defendant again in a hotel in Las Playas, Mexico. Luther agreed to purchase some items for defendant. After the meeting in Mexico, however, Luther contacted the police, who advised him not to meet defendant again in Mexico but rather to lure him back across the border. Accordingly, Luther arranged to meet defendant at the restaurant in San Ysidro where they had earlier met. When defendant appeared at the restaurant, he was arrested.

Following his arrest, defendant was incarcerated in the San Mateo County jail. Joseph Lauricella, defendant's cellmate, testified that defendant gave him a number of descriptions of how the murders occurred. Defendant also told him that he had been turned in by a Navy buddy (Luther) and offered Lauricella $1,000 to have him killed.

Even as defendant was fleeing to Mexico, the police investigation into the killings was focusing on defendant as the prime suspect. A search of defendant's house and two vehicles uncovered a cleaning bill for a leather jacket which stated "pre-spot for blood." The police also found a shirt with blood on it and a black motorcycle helmet. Glass fragments found inside a pair of defendant's socks and gloves matched glass fragments from the broken window of the Hunter residence.

Finally, a number of prosecution witnesses testified about defendant's troubled relationship with his father and stepmother. Defendant's father and natural mother, June Hunter, had separated and divorced in 1973. June Hunter died of cancer in 1979. Following the divorce, Jay Hunter married Ruth Chatburn Hunter. Defendant's sister, who was the administrator of her mother's estate, asked Ruth, a lawyer, to handle the probate. Ruth eventually removed herself from the case, however, because of an argument with defendant sometime in 1980. Defendant felt that he had been cheated of his share of the estate. According to a former roommate of defendant, the dispute became so acrimonious that it caused a rupture of all contacts between defendant and his father.

A second source of animosity between defendant and his parents stemmed from an incident in October 1981, when defendant entered his parents' home in Pacifica while they were on vacation. Mrs. Hunter reported the burglary to the police, who questioned defendant. Mrs. Hunter also apparently searched defendant's residence in Mountain View while defend-

ant was absent. Defendant became angered and upset with his stepmother as a result, and told his roommate that if he went to jail for burglary his father "would be dead."

The acrimony was apparently mutual. Only a month before the murders, in late November 1981, defendant's father instructed his attorney to delete from his will any inheritance for defendant. Mr. Hunter indicated that the matter was not urgent, however, and could wait until the new year. At the time of the murders in late December, the will had not been changed.

## B. Defense Case

The defense presented extensive testimony in an attempt to show that defendant's intense hatred of his father, stemming from emotional and physical abuse he had received as a child, obscured his reasoning to the extent that he was unable to harbor malice or deliberate and premeditate the crimes.

Four former neighbors and family friends testified about defendant's relationship with his father. Joseph and Maxine Sonia DeHazes were friends and neighbors of the Hunters for many years and both testified that Jay Hunter was abusive toward defendant. Mr. DeHazes testified that defendant had been verbally abused by his father since he was an infant. Mrs. DeHazes stated that she observed a clear difference between Jay Hunter's relationship with his daughters and his sons. Mr. Hunter never displayed any affection toward defendant and often hit him. She recalled one incident in which he hit defendant so hard that Mr. DeHazes had to intervene. She further recalled that as defendant grew older the physical abuse turned to verbal abuse. Mrs. DeHazes believed that Mr. Hunter also abused his first wife; she frequently observed June to have bruises and on one occasion saw her with black eyes. Two other former neighbors of the Hunters felt that Jay was very harsh toward defendant and used excessive force.

Defendant's brother, Tom, and his sister, Mary, also testified about defendant's relationship with his father. Tom recalled that his father had inflicted corporal punishment on defendant on many occasions when he was a youth, and was also abusive toward his mother. Tom described his father as an abusive drinker, possibly an alcoholic, who, when drunk, often hit defendant.

Mary, who testified for both the defense and the prosecution, stated she had never witnessed any beatings of defendant by her father. She recalled speaking with defendant on December 29, 1981, the day after the murders, and that defendant said he had been to a funeral the previous day and was

feeling depressed as a result. Carol Lange, a roommate of defendant's girl-friend Judith Goldstein, confirmed that defendant attended her mother's funeral on the morning of December 28, 1981, the day of the murders.

Two psychiatrists also testified on defendant's behalf. Dr. George Wilkinson treated defendant while he was incarcerated in the San Mateo County jail. Dr. Wilkinson stated that he had not observed any evidence of psychosis in defendant, but diagnosed him as clinically depressed; he was unable to determine whether the depression predated defendant's incarceration. Dr. Donald Lunde testified that he had examined defendant on four occasions and concluded that at the time of the killings defendant's mental state limited his ability to premeditate and deliberate, and that it was "unlikely" defendant had premeditated the murders. Dr. Lunde did not detect any evidence of schizophrenia or lack of capacity to obey the law, but believed there was "some diminution of his abilities or his capacity to have harbored malice at that time."

## C. *Penalty Phase Evidence*

The prosecutor presented no additional evidence during the penalty portion of the trial.

The defense presented further testimony from defendant's brother, Tom, who asked the jury to spare his brother's life because he felt that there was hope of his "becoming a Christian." Tom stated that there had been enough death in the family, and that killing his brother would do nothing more than hurt himself and his sisters.

Additionally, defendant presented a lengthy, unsworn oral statement in allocution on his own behalf which was not subject to cross-examination by the prosecutor. In this statement defendant admitted committing several minor juvenile offenses. He stated that he had joined the Navy when he was 17 and described his naval training and experience. He further explained that he had become disenchanted with the Navy when his superior officers allegedly delayed telling him of his mother's death. After that his performance in the Navy deteriorated and he was given a dishonorable discharge that was later upgraded to an honorable discharge.

Defendant stated that his relationship with his father had not been good for several months preceding the killings. His father had become enraged when he learned that defendant had been invited to Tom's high school graduation in June 1981 and, as a result, his father refused to attend.

Defendant stated that he had attended a funeral for Carol Lange's mother on the day of the murders and while there had started to think of his own

mother, who died of cancer just as she was getting her life in order. He began to feel it was unfair that she was dead and his father was alive. He admitted responsibility for the murders but denied that they were committed for money. He acknowledged there was no justification, especially for the murder of his stepmother, whom he did not remember being in the room. Defendant stated that he had been receiving counseling and had made steps toward becoming a different person. He felt that, with his Naval training and continued counseling, he could contribute to society.

## II.

### DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Prosecutorial Discovery*

■ Defendant contends that the trial court committed reversible error by allowing the prosecution to discover certain of the defense investigator's reports pursuant to section 1102.5.[2] The contention is not meritorious.

In *In re Misener* (1985) 38 Cal.3d 543 [213 Cal.Rptr. 569, 698 P.2d 637], decided after the trial of this case, a majority of this court invalidated section 1102.5 on the ground that it contravened the state constitutional privilege against self-incrimination. (*Id.*, at p. 558.) Defendant asserts that *Misener* is retroactive and compels reversal. The Attorney General counters that *Misener* was incorrectly decided and should be overruled. We need not address the merits of *Misener* here, however, for our review of the record reveals that any error under that decision was harmless beyond a reasonable doubt.

The district attorney first requested discovery of a report the defense was using to cross-examine a prosecution witness. The court denied the request, ruling that section 1102.5 permitted discovery only of defense witness statements.

Later, during the testimony of the third defense witness, Joseph De-Hazes, the district attorney requested and was permitted discovery of a

---

[2] Section 1102.5, enacted in 1982, provides in relevant part that "[u]pon motion, the prosecution shall be entitled to obtain from the defendant or his or her counsel, all statements, oral or however preserved, by any defense witness other than the defendant, after that witness has testified on direct examination at trial. At the request of the defendant or his or her counsel, the court shall review the statement in camera and limit discovery to those matters within the scope of the direct testimony of the witness."

nine-page report of a defense interview with the witness and his wife, Maxine Sonia DeHazes. The district attorney subsequently obtained written reports of the defense investigator's interviews with two additional defense witnesses, Carol Huelskamp and Tom Hunter, defendant's younger brother.[3]

Defendant bases his claim of prejudicial error on the prosecutor's use of the reports to cross-examine the witnesses as follows: During his cross-examination of Mrs. DeHazes, the prosecutor asked about an incident, related in the defense investigator's report, in which defendant appeared at Mrs. DeHazes's door late one night pleading to be let in. Defendant explained to her that the police were chasing him for stealing a motorcycle. Mrs. DeHazes let him stay for a while, gave him something to eat and promised not to tell his mother.

Defendant contends that the revelation of this incident damaged Mrs. DeHazes's credibility because it portrayed her as an "accessory to a crime." The contention is without merit. The prosecutor did not use the incident to impeach Mrs. DeHazes's credibility, nor did it have that effect. Indeed, if anything the incident bolstered Mrs. DeHazes's testimony that defendant was subject to excessive physical and verbal discipline at home, and had good reason to fear his father's reaction should he learn of the incident. Furthermore, even if Mrs. DeHazes's testimony was somehow impeached, the jury was left to consider the testimony of numerous other witnesses who had offered similar testimony that defendant was abused by his father. We conclude there is no reasonable possibility that the prosecutor's reference to the incident prejudiced defendant.

Defendant also makes several claims of prejudicial error flowing from the prosecutor's use of a defense investigator's report to cross-examine Tom Hunter. First, the prosecutor asked Tom about a statement in the report to the effect that defendant was "extremely manipulative and habitually told lies . . . ." Tom denied making the statement. Moreover, in light of the record as a whole we are confident that the statement's admission was harmless. Tom had already admitted under cross-examination—*before* the prosecutor's reference to his statement in the defense report—that he knew

---

[3] The record is unclear whether the report relating to Tom Hunter was provided pursuant to section 1102.5 or Evidence Code section 771, which requires production of a writing used to refresh the memory of a witness. On direct examination, defense counsel referred to the report in an attempt to refresh the recollection of the witness. The district attorney objected, whereupon defense counsel provided him with a copy of the statement. We shall assume that defense counsel provided the statement pursuant to the trial court's earlier rulings that such statements were discoverable under section 1102.5, and shall further assume, without deciding, that Evidence Code section 771 does not supersede the constitutional privilege which formed the basis of the holding in *Misener, supra,* 38 Cal.3d 543.

of instances in which defendant had lied and that "part of [defendant's] personality [was] to manipulate." In addition, defendant's sister, Mary Hunter Bizzarri, had previously testified that defendant was "manipulative" and had a "history of lying." Thus, it does not appear that this statement from the defense report appreciably aided the prosecution's case.

Defendant also complains about the prosecutor's reference to an account by Tom, set forth in the defense report, of a 1976 incident in San Diego which resulted in defendant's arrest. The incident was not described in the report, and the prosecutor did not question him about any specifics of the incident at trial. Tom testified that his information had not come from defendant, but rather from his father. The prosecutor referred to the incident only once, very briefly, during guilt phase argument, and not at all during penalty phase argument; indeed, the prosecutor acknowledged at the penalty phase that there was no evidence of any prior crimes or violent conduct by defendant. Thus, we are unable to perceive how this vague, second-hand reference to an unspecified incident during cross-examination could have perceptibly aided the prosecution.

Finally, defendant complains of the prosecutor's questioning of Tom concerning a letter referred to in the defense report that defendant had written to his brother after his arrest. In that letter, according to Tom's statement, defendant wrote that his prison psychiatrist had also examined Charles Manson; the letter closed with the following postscript: "I am quite sane, too bad, it could have been a good defense."

Defendant characterizes this reference to the letter as "nothing less than devastating." The record does not support the claim. Defendant never claimed to be *other* than sane at the time of the shootings. Indeed, both psychiatrists who testified on his behalf readily admitted that defendant had never exhibited psychotic symptoms or delusions. We are thus unable to perceive how these statements from the defense report appreciably prejudiced defendant or aided the prosecution.

That defendant was the shooter was never seriously in dispute. His defense was premised upon a history of child abuse and depression which ultimately so poisoned his judgment that he was unable to control an impulse to kill his father and stepmother when the opportunity presented itself. Nothing in the defense reports discovered by the prosecution controverted this defense or appreciably aided the prosecution. Accordingly, any error in permitting such discovery was harmless beyond a reasonable doubt.

2. *Request for Judicially Conferred Immunity*

Defendant next contends that the trial court erred in denying his request to grant "judicial" use immunity to his girlfriend, Judith Goldstein,

so as to overcome Goldstein's Fifth Amendment claim. Defendant premises his argument on the Sixth Amendment right to compulsory process and the Fifth Amendment right to due process.

The district attorney had charged Ms. Goldstein with being an accessory after the fact to the murders. Her case was pending at the time of defendant's trial. The defense called her to testify but she refused to answer any questions on the basis of her Fifth Amendment privilege against self-incrimination. Defense counsel thereupon renewed his request, raised prior to trial, to grant use immunity to Ms. Goldstein. The trial court asked counsel for an offer of proof as to what he expected Ms. Goldstein's testimony to reveal. Counsel, in response, recalled that earlier testimony had established that on the morning of the murder, December 28, 1981, defendant had accompanied Ms. Goldstein to the funeral of the mother of Ms. Goldstein's roommate, Carol Lange. Counsel then explained: "It is my understanding that during the course of that [funeral] ceremony . . . [defendant] made the statement to Judith Goldstein—or a question, possibly—'Why is it the good people die and the bad still live.' [¶] I submit, Your Honor, that it is material to the question of the mental state of the defendant on the 28th day of December of 1981." The trial court denied the request.

■ It is settled in California that the granting of transactional immunity is conditioned upon a written request by the prosecutor that the witness be compelled to answer. (§ 1324; *In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229].) ■ ■ ■ ■ ■ Defendant contends, however, that the defendant in a criminal action should be entitled to request that the court grant use immunity to a defense witness who has knowledge of essential, exculpatory evidence.[4]

The contention is unavailing. As the Attorney General points out, the Courts of Appeal of this state have uniformly rejected the notion that a trial court has the inherent power, in such circumstances, to confer use immunity upon a witness called by the defense. (See *People* v. *Estrada* (1986) 176 Cal.App.3d 410, 418 [221 Cal.Rptr. 922]; *People* v. *DeFreitas, supra,* 140 Cal.App.3d at pp. 839-841; *People* v. *Sutter* (1982) 134 Cal.App.3d 806, 812-817 [184 Cal.Rptr. 829].) With few exceptions, federal and state judicial authority across the nation is to the same effect. (See *People* v. *DeFreitas, supra,* 140 Cal.App.3d at pp. 838-839; Annot. (1981) 4 A.L.R.4th 617.)

---

[4]Use immunity protects a witness only against the actual use of his compelled testimony, as well as the use of evidence derived therefrom. Transactional immunity protects the witness against all later prosecutions relating to matters about which he testifies. (*Kastigar* v. *United States* (1972) 406 U.S. 441, 449-453, 460 [32 L.Ed.2d 212, 219-222, 226, 92 S.Ct. 1653]; *People* v. *DeFreitas* (1983) 140 Cal.App.3d 835, 837 [189 Cal.Rptr. 814].)

Though it is possible to hypothesize cases where a judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process and a fair trial (see e.g., Note, *Separation of Powers and Defense Witness Immunity* (1977) 66 Georgetown L.J. 51), that is not a question we need here decide. For defendant's offer of proof at trial in support of his request fell well short of the standards set forth in the one case which has clearly recognized such a right, *Government of Virgin Islands* v. *Smith* (3d Cir. 1980) 615 F.2d 964. While holding that in certain cases a court may have authority to confer a judicially fashioned immunity upon a witness whose testimony is essential to an effective defense, the *Smith* court also recognized that "the opportunities for judicial use of this immunity power must be clearly limited; . . . the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity . . . . [¶] [T]he defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or it is found to relate only to the credibility of the government's witnesses." (*Id.*, at p. 972.)

As noted above, defense counsel's offer of proof was that Ms. Goldstein would testify that defendant was depressed as a result of attending a funeral, and that he had made the statement, "Why is it the good people die and the bad still live." Even assuming that the proffered testimony was not inadmissible hearsay, it did not meet *Smith*'s requirement that the evidence be "clearly exculpatory and essential." At best, the evidence was cumulative of the extensive testimony of other defense witnesses. It was well established that defendant had been abused by his father. Furthermore, defendant's sister testified that she spoke with defendant the day after the murder, and recalled that defendant stated he was feeling depressed from having attended a funeral the previous day. In addition, Dr. Lunde, a psychiatrist, offered his expert opinion that defendant was clinically depressed on the day of the murder and could not, as a result, have committed a willful, deliberate and premeditated murder. In short, defendant failed to demonstrate that the proffered testimony was "clearly exculpatory and essential" to his defense.

Defendant points out that the testimony of three witnesses for the prosecution, Thomas Henkemeyer, Jefferson Schar and Gary Sayers, had been obtained pursuant to a request for transactional immunity by the district attorney under the authority of section 1324. There is no evidence to suggest, however, that the prosecutor intentionally withheld transactional immunity from Goldstein solely to assure the exclusion of her testimony. ▪ We agree the prosecutor's duty is to administer the immunity

power evenhandedly, with a view to ascertaining the truth, and not as a partisan engaged in a legal game. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 405 [121 Cal.Rptr. 261, 534 P.2d 1341]; *In re Ferguson* (1971) 5 Cal.3d 525, 531-532 [96 Cal.Rptr. 594, 487 P.2d 1234]; cf. *United States* v. *DePalma* (S.D.N.Y. 1979) 476 F.Supp. 775, 780-782 [conviction reversed because of government's selective grant of immunity to two prosecution witnesses and refusal to grant immunity to two other key defense witnesses]; *United States* v. *Herman* (3d Cir. 1978) 589 F.2d 1191, 1204, cert. den. 441 U.S. 913 [60 L.Ed.2d 386, 99 S.Ct. 2014] [government may not selectively grant or refuse immunity "with the deliberate intention of distorting the judicial fact finding process"].) ■ However, there is no evidence here that the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential, noncumulative exculpatory evidence.

Thus, even if in appropriate circumstances an essential witness for a criminal defendant should be granted judicial use immunity—a question we do not decide—the record establishes that the circumstances were not appropriate here and the court did not err in denying the immunity request.

■ Defendant also asserts that the trial court erred in denying his request to continue his case until the conclusion of Goldstein's case. As Goldstein's testimony was not shown to be essential, however, we cannot say that the trial court abused its discretion in denying the request.

3. *Instruction on CALJIC No. 8.75*

■ Defendant next contends that the trial court's instruction pursuant to CALJIC No. 8.75 impermissibly deprived the jury of the opportunity to consider and deliberate upon possible lesser offenses. The contention is without merit.

■ In *People* v. *Kurtzman* (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572], we recently construed our holding in *Stone* v. *Superior Court* (1982) 31 Cal.3d 503 [183 Cal.Rptr. 647, 646 P.2d 809] "to authorize an instruction that the jury may not *return a verdict* on the lesser offense unless it has agreed beyond a reasonable doubt that defendant is not guilty of the greater crime charged, but it should not be interpreted to prohibit a jury from *considering* or *discussing* the lesser offenses before returning a verdict on the greater offense."[5] (46 Cal.3d at p. 329, original italics.) ■ Thus, *Kurtzman* reaffirmed the trial court's broad discretion "to forestall an anticipated deadlock or to assist the jury in moving beyond an actually

[5] The reference to "beyond a reasonable doubt" in *People* v. *Kurtzman, supra,* 46 Cal.3d at page 329, was no doubt inadvertent. A defendant of course is not required to prove that he is not guilty beyond a reasonable doubt.

threatened deadlock by directing the jury under an instruction such as CALJIC No. 8.75 at least as to the sequence in which verdicts will have to be ultimately rendered." (*Id.*, at pp. 331-332.) We concluded the trial court in *Kurtzman* had erred by deviating from the standard charge and instructing the jury it could not "consider" a lesser offense until it had reached unanimity on the greater offense. (*Id.*, at p. 335.) We held, however, that the error was harmless. (*Ibid.*)

Here, the trial court instructed the jury in the precise language of CALJIC No. 8.75 (1982) that "you must unanimously agree that the defendant is not guilty of first degree murder before you may find defendant guilty or not guilty of second degree murder," and "[y]ou must unanimously agree that defendant is not guilty of second degree murder before you find him guilty or not guilty of voluntary or involuntary manslaughter." While we noted in *Kurtzman* some potential "ambiguity" in the standard instruction (46 Cal.3d at p. 336; see also *People* v. *Hernandez* (1988) 47 Cal.3d 315, 352 [253 Cal.Rptr. 199, 763 P.2d 1289]), we find nothing in the pertinent language of the instruction as given here or in the record of the jury's deliberations as a whole, to suggest that the jury believed it must return a verdict on the greater offense before it could consider or discuss the lesser included offenses. (*People* v. *Hernandez, supra,* 47 Cal.3d at pp. 352-353.) Accordingly, we find no error in the court's instructing in the language of CALJIC No. 8.75.

### 4. *Instruction on the Testimony of Immunized Witnesses*

■ Defendant next contends that the trial court erred in refusing to give requested cautionary instructions on the testimony of immunized witnesses.

Three prosecution witnesses, Thomas Henkemeyer, Gary Sayers and Jefferson Schar, testified under a grant of immunity from prosecution. Each of the witnesses had been charged as an accessory after the fact in helping defendant flee to Mexico. Each testified as to admissions made by defendant before and after the killings.

Defendant requested jury instructions stating that the testimony of immunized witnesses must be viewed with "suspicion" and examined with "greater care and caution" than the "testimony of an ordinary witness." The trial court modified the requested instruction, directing the jury to determine whether an immunized witness's "testimony has been affected by it [*sic*] or by his prejudice against the defendant," but to weigh the witness's credibility "by the same standards by which you determine the credibility of other witnesses." The trial court also gave the standard instruction on

witness credibility (CALJIC No. 2.20), which directed the jury to weigh, inter alia, the "existence or nonexistence of a bias, interest or other motive."

Defendant contends the trial court committed reversible error in failing to give the requested instruction verbatim. The contention lacks merit.

Evidence Code section 411 provides that "[e]xcept where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." The Penal Code sets forth the exceptions in criminal cases, which include, inter alia, accomplice testimony. (See § 1111 [accomplice testimony insufficient for conviction if uncorroborated].) Thus, it is well settled that trial courts are required, under the appropriate circumstances, to give special cautionary instructions concerning accomplice testimony. (*People* v. *Terry* (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961].) Generally, however, as we observed in *People* v. *Alcala* (1984) 36 Cal.3d 604, 623 [205 Cal.Rptr. 775, 685 P.2d 1126], "an interested witness' 'entitle[ment] to full credit' under section 411 is a matter for the trier of fact." Accordingly, we rejected in *Alcala* the claim that an informant is analogous to an accomplice, observing: "The exception for accomplice testimony . . . arises from the accomplice's overwhelming motive to shift blame to defendant. He must do so, either to minimize his own liability at trial, or to convince the authorities it is worth immunizing him to obtain his testimony against the defendant. Whatever consideration a jailhouse informant may expect for testifying, *the direct, compelling motive to lie is absent*." (*Id.*, at p. 624, italics added; see also *People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776].)

No California authority supports defendant's contention that an immunized witness, unlike an informant, is so analogous to an accomplice that a trial court must, upon request, give cautionary instructions as to the trustworthiness of immunized witness testimony. In *People* v. *Leach* (1985) 41 Cal.3d 92, 106 [221 Cal.Rptr. 826, 710 P.2d 893], we held that a trial court was not required to give such cautionary instructions sua sponte, but did not address a court's duty to give such instructions upon request. Defendant relies on law developed by the federal courts holding that a defendant is entitled on request to an instruction that the testimony of informers, accomplices and immunized witnesses should be viewed with suspicion. (See *United States* v. *Watson* (7th Cir. 1980) 623 F.2d 1198, 1205; *United States* v. *Morgan* (9th Cir. 1977) 555 F.2d 238, 242-243.)

No California decision has adopted or applied the federal rule, however, and the reason is not difficult to perceive. Under federal law the prosecutor cannot grant transactional immunity. (18 U.S.C. § 6002; *United States* v.

*Herman, supra,* 589 F.2d at p. 1202; *United States* v. *Leonard* (D.C. Cir. 1979) 494 F.2d 955, 961, fn. 11.) Thus, the government remains free to prosecute the witness after he testifies, as long as the prosecution is not based on the witness's testimony. The grant of immunity therefore does not totally eliminate the witness's incentive to testify falsely. (*United States* v. *Leonard, supra,* 494 F.2d at p. 961, fn. 11.) California law, however, provides that a witness ordered to testify over a claim of self-incrimination shall be given transactional immunity. (§ 1324; *Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193]; *People* v. *DeFreitas, supra,* 140 Cal.App.3d at pp. 839-840.) The prosecution's leverage over the witness is thereby sharply diminished, as is the witness's motive to falsify. Thus, to paraphrase *Alcala,* "whatever consideration [an immunized witness] may expect for testifying, the direct, compelling motive to lie is absent." (36 Cal.3d at p. 624.)

We conclude, accordingly, that the trial court did not err in refusing to give verbatim the instruction requested by defendant. The general instruction on witness credibility, coupled with the modified instruction specifically directing the jury to determine whether the immunized witness's credibility had been affected by the grant of immunity, adequately informed the jury of the necessity to weigh the motives of the immunized witnesses.

### 5. *Instruction on Transferred Intent*

At defendant's request, the trial court instructed the jury on the doctrine of transferred intent (CALJIC No. 8.65) as follows: "Where one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed."

Defendant now argues that the instruction on transferred intent was unnecessary and improper because both victims in this case were killed. He contends that the instruction may have prejudicially misled the jury to transfer findings of intent, premeditation and deliberation with respect to the killing of his father, Jay Hunter, to the killing of his stepmother, Ruth Chatburn Hunter. The contention is not meritorious even if the doctrine of invited error is ignored.

While we have approved the rule of transferred intent in several cases involving homicides (*People* v. *Sears* (1970) 2 Cal.3d 180, 189 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Sutic* (1953) 41 Cal.2d 483, 491-492 [261 P.2d 241]; *People* v. *Suesser* (1904) 142 Cal. 354, 366-367 [75 P. 1093]), we have not considered application of the doctrine where both the intended and the unintended victim are killed or injured. (See, however, *People* v. *Czahara*

(1988) 203 Cal.App.3d 1468 [250 Cal.Rptr. 836]; *People* v. *Birreuta* (1984) 162 Cal.App.3d 454 [208 Cal.Rptr. 635]; *People* v. *Carlson* (1974) 37 Cal.App.3d 349 [112 Cal.Rptr. 321].) Nor need we do so here. For even assuming arguendo that the giving of the instruction was error, no prejudice could conceivably have resulted therefrom.

The record is unclear as to why defense counsel requested CALJIC No. 8.65. The prosecutor did not object to the instruction but observed that in his view it was not applicable to the facts. Defense counsel responded, "It works both ways . . . ." Apparently counsel thought the instruction would bolster his argument that any heat of passion or diminished capacity defense which mitigated the killing of Jay Hunter would apply to the killing of Ruth Hunter, for that was the only context in which counsel referred to the instruction during closing argument. On rebuttal, the prosecutor pointedly argued to the jury that the transferred intent instruction "has no application to these facts," that in fact defendant had deliberated, premeditated and made a "conscious decision to kill both [victims] . . . ."

Indeed, the prosecution's case against defendant was premised entirely on the theory that defendant had committed two premeditated first degree murders. The record amply supported that thesis. The evidence of motive and planning as to *both* killings was overwhelming. Numerous witnesses testified concerning defendant's hatred of his father and bitter resentment of his stepmother. Defendant's grievance against his stepmother stemmed, in part, from her handling of his natural mother's estate. His dispute with her over this matter led to a further estrangement from his father. Several witnesses also testified as to defendant's simmering anger over the fact that his stepmother had apparently called the police to report defendant's unauthorized entry into his parents' home while they were away on vacation. Thomas Henkemeyer, defendant's friend from the Navy, recalled a conversation with defendant shortly before the murders in which defendant discussed plans "to go up and kill his mother and father." Henkemeyer gathered that defendant's motive was "to take vengeance [*sic*] against his mother and step-father [*sic*]." Henkemeyer also recalled receiving a telephone call from defendant shortly after the murders in which defendant stated that he had "killed his mother and father."

The physical evidence also strongly supported the theory that both killings were intentional. Both bodies were found in the bedroom, Jay Hunter's on the bed, Ruth Hunter's sprawled on the floor covering a telephone receiver. Autopsies revealed that Ruth Hunter died from two shotgun blasts to the head, either of which was capable of causing death; Jay Hunter had been shot four times. Eight expended shotgun casings were found in the bedroom and hall.

The only fragment of evidence even remotely suggesting that Ruth Hunter's killing might have been unintentional was Dr. Lunde's testimony that defendant told him he had no memory of shooting Ruth. Dr. Lunde construed this statement as evidence of a posttrauma amnesia, however, not as evidence that defendant was unaware of Ruth's presence at the time of the killings.

Thus, even assuming that the instruction on transferred intent was neither factually nor legally relevant, it is inconceivable that the jury might have been misled to transfer its findings that defendant premeditated and deliberated the intentional killing of Jay Hunter, to the killing of Ruth Hunter. There was no evidence that Ruth's killing was the unintentional byproduct of the killing of Jay; there was no argument to the jury to that effect; the jury gave no signs that it was confused by the instruction; the prosecutor expressly advised the jury to disregard the instruction and the trial court, of course, directed the jury to ignore any inapplicable instructions. Under the circumstances, we are persuaded that any instructional error—invited or otherwise—was harmless under any standard of prejudice.

B. *Penalty Phase Issues*

1. *Judicially Conferred Immunity*

 Defendant contends that the trial court erred in denying his renewed request at the penalty phase of trial to grant immunity to his girlfriend, Judith Goldstein. The contention is without merit.

It is well settled that a defendant is entitled under the Eighth and Fourteenth Amendments to present at the penalty phase of trial all relevant mitigating evidence relating to his character and background or the circumstances of the offense. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110-117 [71 L.Ed.2d 1, 108-112, 102 S.Ct. 869].)

Defense counsel renewed his request at the penalty phase for a grant of immunity to defendant's girlfriend, Judith Goldstein, so that she might offer "evidence in mitigation." Defense counsel made no other offer of proof. As indicated earlier, counsel's only offer of proof in support of the motion at guilt phase was that Ms. Goldstein would testify defendant became depressed while attending the funeral of the mother of Ms. Goldstein's roommate, Carol Lange, and had made a statement about the good dying young while the bad lived on.

Even assuming, without purporting to decide, that the trial court had the authority to confer use immunity on the proposed witness, we cannot conclude on this record that the court erred. There is nothing in the record to demonstrate defendant was denied highly relevant mitigating evidence, or to reveal the nature of that evidence. Even assuming that the evidence would have generally related to defendant's state of mind on the morning of the murder, we cannot find that the absence of Ms. Goldstein's testimony prejudiced defendant. The jury had already been presented evidence of defendant's purported depression at the guilt phase through the testimony of two psychiatrists. Moreover, defendant expressly indicated in his statement in allocution that his attendance at the funeral made him feel that "it was unfair that [his] father was still alive."

Accordingly, we conclude that the trial court did not err in denying defendant's request that Ms. Goldstein be granted judicial immunity.

2. *Response to Jury Inquiry*

██ Defendant next contends that the trial court committed reversible error by failing to respond adequately to jury questions concerning the possibility of parole. The contention is without merit.

The trial court did not give the so-called Briggs Instruction which this court invalidated in *People v. Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908], reversed *sub nom. California v. Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446], and in *People v. Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], certiorari denied 471 U.S. 1119 [86 L.Ed.2d 266, 105 S.Ct. 2367] (*Ramos II*), and the prosecutor did not refer to the Governor's power to pardon or commute a sentence in his argument to the jury at the close of the penalty phase of trial.

During the penalty deliberations, however, the jury sent the court a note with the following questions: "One, under what circumstances could [defendant] be released from prison? [¶] Two, a change in the law and action of the Supreme Court? [¶] We know of several cases wherein the man convicted of sentencing to life [*sic*], without possibility of parole, is out on the streets: Why?"

After consulting with counsel, the trial court delivered the following instruction and admonition to the jury:

"Now as to the first and second questions, you are instructed that under the State Constitution, a governor is empowered to grant a reprieve, pardon, or commutation after sentence, *following conviction of a crime.*

"Under this power, the governor may, in the future, commute or modify a sentence of life imprisonment without possibility of parole, to a lesser sentence. That would include the possibility of parole.

"A sentence of life imprisonment, without a possibility of parole, *means that the defendant will spend the remainder of his natural life in prison.* Therefore, the matter of parole is not to be considered by you in determining the punishment for the defendant.

"If, upon consideration of the evidence, you believe that life imprisonment, without possibility of parole, is the proper sentence, you must assume those officials charged with the operation of our prison system will perform their duties in that regard in a correct and responsible manner.

"*It would be a violation of your duty, as jurors, if you were to fix the penalty at death because of a doubt that the prison authorities or the governor of the state will properly carry out their responsibilities.*

"Therefore, you are limited to those matters that are properly before you in this case, which have been brought to your attention by the evidence and by the instructions of the Court, *and are not to consider matters that are not properly before you by the evidence or the instructions of the Court.*

"Now, I believe that those would cover the matters that are properly before you, and should aid and assist you in your decisions and your deliberations in these matters." (Italics added.)

In an effort to supplement the foregoing instruction, defense counsel moved to reopen the penalty phase to present evidence that no defendant's life sentence had been commuted in recent times, and also asked the court to question the jurors concerning their supposed knowledge of persons who had been released from life sentences. The trial court denied both requests.

In *Ramos II, supra,* 37 Cal.3d at page 159, footnote 12, we observed that while the trial court should not instruct as to the Governor's commutation power in the first instance, when the jury itself raises the issue, "the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence . . . ."

Though the trial court here did not have the benefit of the foregoing advice because *Ramos II* was decided after the trial in this case, it antici-

pated our concerns by correctly admonishing the jurors that in determining defendant's sentence they were not to consider the Governor's power to commute or modify sentences, including the power to grant parole, that it would violate their duty as jurors if they were to fix the sentence at death out of a concern for possible future actions by the Governor or the parole board, and that they were not to consider any matters not properly before them by the evidence or the instructions. As we have previously held, such curative instructions, directing the jury not to make any use of the Governor's commutative and parole powers, are adequate to advise the jury as to their proper sentencing considerations and responsibilities. (*People* v. *Hovey, supra,* 44 Cal.3d at p. 584; *People* v. *Coleman* (1988) 46 Cal.3d 749, 780-782 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Hamilton* (1988) 45 Cal.3d 351, 372-376 [247 Cal.Rptr. 31, 753 P.2d 1109].) Furthermore, as we observed in *Hovey,* in view of the trial court's clear and direct instructions not to consider extraneous matters, we "see no likelihood of prejudice from the fact that the trial court failed to give further explanation that the Governor's commutation power would apply to both a life without parole sentence and a death sentence." (*People* v. *Hovey, supra,* 44 Cal.3d at p. 584.) Indeed, the court did inform the jury without limitation that the Governor's commutation powers apply "after sentence following conviction of a crime."

Defendant, nevertheless, urged at oral argument that the trial court may have misled the jury by instructing that "the matter of parole is not to be considered by you in determining the punishment for the defendant." We perceive no possibility, however, that the jury might thereby have been led to believe that they might consider the Governor's commutation power but not his parole power. That interpretation of the court's statements is entirely unreasonable. As noted, the jury was informed that they would violate their oath as jurors if they were to fix the penalty at death because of a doubt that the Governor or the parole board would properly carry out their responsibilities. They were informed in no uncertain terms that they were "not to consider matters that are not properly before [them] by the evidence or the instructions of the Court." Accordingly, we perceive no possibility that the jury was confused as to its proper sentencing considerations and responsibilities.

Defendant also contends the trial court erred prejudicially in denying counsel's request to reopen the penalty phase to show that no life prisoner had received a commutation in recent memory. Though the United States Supreme Court in *Ramos* v. *California, supra,* 463 U.S. 992, concluded that the Briggs Instruction was not violative of the federal constitution, in part because "the defendant may offer evidence or argument regarding the commutation power" (*id.,* at pp. 1004-1005, fn. 19 [77 L.Ed.2d at p. 1183]), that

does not suggest the Constitution compels such evidence. Indeed, where—as here—the jury has been admonished to disregard the commutation power, such evidence would have been wholly irrelevant. The trial court thus did not err in denying counsel's request.

Finally, defendant contends that the trial court erred in denying counsel's request, pursuant to section 1120, that it question the jury concerning the statement in their note, "[w]e know of several cases wherein the man convicted of sentencing to life [*sic*], without possibility of parole, is out on the streets." Under section 1120, if the court is put on notice that a juror "has any personal knowledge respecting a fact in controversy in a cause," it must examine the juror "to determine whether good cause exists for his discharge . . . ." (§ 1120; *People* v. *McNeal* (1979) 90 Cal.App.3d 830, 837 [153 Cal.Rptr. 706].) In the present case, it is far from clear that the jury's statement indicated "personal knowledge of facts in controversy" within the meaning of section 1120, rather than merely general awareness of the availability of commutation and parole and the perception that many death sentences have been reversed. (See *Ramos II, supra,* 37 Cal.3d at p. 159, fn. 12.) In any event, as previously noted, we find the trial court's direct admonitions to the jury, not to consider any matters not properly before them by way of evidence or instructions, were adequate to redirect the jury's attention to its proper sentencing responsibilities. (*People* v. *Hovey, supra,* 44 Cal.3d at p. 584.)

### 3. *Alleged Brown Error*

 Defendant contends that the court's instruction misled the jury regarding the scope of its sentencing responsibility and discretion.

The trial court instructed the jury in accordance with section 190.3 (former CALJIC No. 8.84.2).[6] In *People* v. *Brown* (1985) 40 Cal.3d 512, 540-544 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we recognized that this instruction, given in isolation, had the potential for misleading the jury as to the scope of its sentencing discretion. "Our concerns were twofold and interrelated: that a juror might understand his function as (i) merely the 'counting' of factors and then (ii) reaching an

---

[6] The court stated: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death. However, if you determine that the mitigating circumstances outweight [*sic*] the aggravating circumstances, you shall impose the sentence of confinement in the State Prison for life without the possibility of parole."

'automatic' decision, with no exercise of personal responsibility for deciding, by his own standards, which penalty was appropriate." (*People* v. *Milner* (1988) 45 Cal.3d 227, 256 [246 Cal.Rptr. 713, 753 P.2d 669]; see *People* v. *Burton* (1988) 48 Cal.3d 843, 869 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115].) Therefore in cases such as this, tried before *Brown,* we examine the entire record "to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion . . . ." (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

 Here, there is no possibility of jury confusion concerning its responsibility to weigh, rather than count, the applicable factors. In addition to the standard CALJIC No. 8.84.2 instruction, the trial court correctly informed the jury as to how it was to undertake the weighing process as follows: "In weighing the aggravating and mitigating factors, you are not to merely count the numbers on each side. You are instructed rather, to weigh and consider the factors. One mitigating or aggravating circumstance may be sufficient to support a decision that death is or is not the appropriate punishment in this case. [¶] The weight you give to any factor is for you, individually, to decide. [¶] The particular weight of such opposing circumstances is not determined by the relative number, but rather by their relative convincing force on the ultimate question of punishment."

Defendant asserts, however, that the prosecutor's argument relieved the jury of its responsibility to serve as conscience of the community, to decide, by its own moral standards, which penalty was appropriate. In support, defendant cites two statements from the prosecutor's closing argument. The first urged the jury "to apply the law. You were sworn to apply the law regardless of how distasteful a result may be to you." The second statement was as follows: "After you make a determination as to the appropriate existence or nonexistence of the aggravating and mitigating circumstances in this case, then your choice is a real simple one. I don't mean to be callous when I say that, believe me. Your choice is one of balancing. That's the test. It's just a balancing test, and, indeed, any one factor which you find to be persuasive and true can be the factor that you can rely upon in reaching your verdict, whether it be for death or whether it be for life without possibility of parole."

Defendant asserts that the jury was misled by the prosecutor's exhortation to apply the law no matter how "distasteful," and his suggestion that the task was a "simple one . . . just a balancing test . . . ." Viewed in context, however, it is apparent that by urging the jury to "follow the law regardless of how distasteful" the prosecutor was simply exhorting the

jurors to abide by their oaths, to remain faithful to their assurances during voir dire that they could put aside their personal feelings about the death penalty and decide the appropriate punishment based on the evidence and facts presented. Indeed, just moments after his reference to the jury's duty "to follow the law," the prosecutor recalled that during voir dire, "counsel and I asked you questions regarding the subject of the death penalty . . . . We posed questions in a vacuum and you responded in that context, of course. As we seat ourselves in this courtroom today, the vacuum is no longer in existence. You have the facts before you. So essentially what you have to do . . . is make a resolution of what the facts are . . . *and then make a moral assessment as triers of the facts.*"

Defense counsel further emphasized the jury's discretion to exercise independent moral judgment. He informed the jury: "[T]he law is quite clear, regardless of what facts in aggravation or mitigation you may find. You may still say, 'I will be merciful.' You may still say that 'I am not going to exact the extreme penalty.' You can still say that the defendant is deserving of the right to live a life and die of natural consequences, even if in prison."

In light of these arguments, there is no reasonable possibility that the jury was misled as to its personal moral responsibility to determine the appropriate punishment.

Nor does it appear that the jury was misled by the prosecutor's offhand remark that its choice was a "simple one." In context, it is apparent that the prosecutor was explaining to the jury that its decision was anything but simple. For in the very next breath the prosecutor emphasized that in balancing the aggravating and mitigating factors, "any one factor which you find to be persuasive and true can be the factor that you can rely upon in reaching your verdict, whether it be for death or whether it be for life without possibility of parole. [¶] In other words . . . if you conclude that there are five factors pointing one way and one pointing another way and if you individually conclude that the one factor . . . has more persuasive value and more significance in your mind, then you can conclude that that should be the direction I'd voice my verdict . . . ."

Defense counsel echoed the prosecutor's remarks in his final words to the jury: "We can go on and on . . . but I want to leave you with one thought, and that is this: regardless of what aggravating circumstances are present here, if you find any one mitigating circumstance that has so much weight in your mind that it overshadows any and all of the aggravating circumstances, you have the right to return a verdict of . . . life without possibility of parole . . . . You can do so because of pity. You can do so because of compassion. You can do so because of sympathy or you can do so for just

outright mercy. That is what the law allows you to do and you can apply that law if you so choose . . . . [It's] a question of what you feel in your own heart and in your own conscience."

This case is thus essentially indistinguishable from *People* v. *Burton, supra,* 48 Cal.3d 843, where we held it was not prejudicial for the prosecutor to urge the jury to "follow the law" where he also stressed that the jury was the "conscience of the community," that it spoke " 'on behalf of the community . . . as to what the right thing to do in this case is.' " (*Id.,* at pp. 870-872; see also *People* v. *Hendricks* (1988) 44 Cal.3d 635, 655 [244 Cal.Rptr. 181, 749 P.2d 836] [" '[W]e see no impropriety in a prosecutor urging that the jurors "follow the law" and base their penalty decision on a weighing of the applicable factors, so long as it is understood that *inherent in the weighing process itself is the determination of "appropriateness."* ' "].) " 'Obviously, when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, *they necessarily understand they have discretion to determine the appropriate penalty.*' " (*People* v. *Burton, supra,* 48 Cal.3d at p. 873, original italics.)

In short, it is manifest from the record that the prosecutor in this case was not urging the jury to disregard their personal views concerning the appropriateness of death, but just the reverse; the prosecutor counseled the jury that one mitigating factor could outweigh five aggravating factors if it so decided, and he urged the jury not once, but twice, to make a "moral assessment" of the facts. Hence, we conclude no reasonable jury could have been misled as to its responsibility and discretion to determine, through the weighing process, whether death or life without possibility of parole was the appropriate punishment for defendant. (*People* v. *Brown* (1988) 46 Cal.3d 432, 454 [250 Cal.Rptr. 604, 758 P.2d 1135].)

4. *Extreme Mental or Emotional Disturbance as a Mitigating Factor*

 In accordance with section 190.3, factor (d) (CALJIC No. 8.84.1) the jury was instructed to consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant asserts that the foregoing instruction, by referring to an "extreme" condition, indicated that any "lesser disturbance" would not be a possible mitigating factor. We cannot agree.

First, it should be noted that the trial court instructed the jury that it was to consider "any other circumstance which extenuates the gravity of the crime . . . ." (§ 190.3, factor (k); CALJIC No. 8.84.1.) In *People* v. *Ghent* (1987) 43 Cal.3d 739 [239 Cal.Rptr. 82, 739 P.2d 1250], we concluded that

this " 'catchall' provision is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (*Id.*, at p. 776; accord *People* v. *Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Brown, supra,* 46 Cal.3d at pp. 457-458; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 720-721 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 296-297 [247 Cal.Rptr. 1, 753 P.2d 1052].)

The trial court and counsel went beyond this, however, focusing specifically on the evidence of emotional disturbance, i.e., the emotional and physical abuse defendant suffered at the hands of his father, which he claimed served to mitigate the offense. At defendant's request the court instructed that, in addition to the statutory mitigating factors, the jury could consider as an additional mitigating factor "whether the defendant was subjected to physical abuse or cruelty during his formative years." In addition, the prosecutor and defense counsel devoted considerable argument to defendant's claim of emotional disturbance. The prosecutor discussed the evidence that defendant was abused as a child and the psychiatrists' testimony concerning its effect on defendant, as well as defendant's claim that he was depressed on the day of the murder, arguing that such evidence—even if true—did not merit lesser punishment. Defense counsel argued in response that the proof was overwhelming defendant was a battered child, and that "[t]here is no question from both of his doctors . . . there was emotional disturbance . . . . So, therefore we have another factor in mitigation."

Thus, far from precluding the jury from considering defendant's evidence of emotional disturbance, the court and counsel directly addressed such evidence. In this respect, this case is practically indistinguishable from *People* v. *Hernandez, supra,* 47 Cal.3d at pages 359-360, *People* v. *Babbitt, supra,* 45 Cal.3d at pages 720-721, and *People* v. *Lucky, supra,* 45 Cal.3d at pages 296-297, where we similarly concluded that the court's instructions and the arguments of counsel properly allowed the jury to consider any mitigating evidence relating to defendant's alleged mental disturbance at the time of the crimes. Defendant's contention to the contrary is clearly without merit.

5. *Prosecutor's Comment Concerning Defendant's Statement in Allocution*

Over the objections of the prosecution, the trial court permitted defendant to make a statement in allocution. Later, during the prosecutor's closing argument, the prosecutor made several references to defendant's statement

and twice noted that defendant was not subject to cross-examination concerning the allocutory statement. Defense counsel objected to the prosecutor's remarks concerning cross-examination. The trial court, in response, explained to the jury: "[T]he court has allowed, in this case, the defendant to exercise what is known as a right of allocution . . . it's the matter by which a party may make a statement in these particular types of instances. The party, of course, who makes the statement is not under oath and, as a witness on the stand, of course, is not subject to direct cross-examination."

Defendant now contends that the prosecutor's comments concerning the lack of cross-examination constituted prejudicial error. The contention is without merit.

We have held that the defendant does *not* have the " 'right to address the sentencer without being subject to cross-examination' in capital cases." (*People* v. *Robbins* (1988) 45 Cal.3d 867, 888-890 [248 Cal.Rptr. 172, 755 P.2d 355].) As we recently explained in *People* v. *Keenan* (1988) 46 Cal.3d 478, 511 [250 Cal.Rptr. 550, 758 P.2d 1081]: "*Robbins* is persuasive that the right of allocution is unavailable in California capital penalty trials. Its principal purpose in such cases would be to cloak defendant's right to testify with a unique immunity from cross-examination by the People. Recognition of a right to allocution is unnecessary to a fair trial and runs counter to the [death penalty] statute's purpose of providing the sentencer with all relevant information bearing on the appropriate penalty."

In light of our holding that neither the Constitution nor the death penalty statute gives defendant "the right to testify with a unique immunity from examination by the People" (*People* v. *Keenan, supra,* 46 Cal.3d at p. 511), we can hardly fault the prosecutor here for simply calling attention to the fact that defendant's testimony was not subject to cross-examination. Defendant's assertions that the prosecutor's remarks impermissibly implied that he possessed unrevealed facts to impeach defendant's statement, and constituted improper comment on defendant's silence, are patently without merit. We have examined the record and find nothing in the prosecutor's remarks to support either claim.

6. *Defendant's Background and Character Evidence*

The trial court instructed the jury in terms of former CALJIC No. 8.84.1, but modified factor (k) of that instruction to state that the jury shall consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, *including but not limited to the defendant's character, background, history, mental condition, and physical condition on record.*"

Citing this court's decisions in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813] and *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861], defendant maintains that the court's instructions improperly limited the jury's consideration of his mitigating background and character evidence. In determining whether the sentencer was adequately informed of its responsibility to consider all the defendant's mitigating evidence, we examine the instructions and arguments as a whole. (*People* v. *Lucky, supra,* 45 Cal.3d at p. 298.) That examination persuades us the jury could not have been misled as to its duty to weigh and consider all the mitigating evidence. As indicated, the court modified the standard factor (k) instruction, specifically directing the jury to consider defendant's background and character evidence; the prosecutor in his argument addressed the potentially mitigating evidence and defense counsel stressed its mitigating effect. On this record, we conclude that the jury could not possibly have been misled about its responsibility to consider all the proffered evidence. (See *People* v. *Burton, supra,* 48 Cal.3d at pp. 866-867; *People* v. *Keenan, supra,* 46 Cal.3d at pp. 514-515.)

## DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., and Kennard, J., concurred.

Appellant's petition for a rehearing was denied February 1, 1990, and the opinion was modified to read as printed above.