[No. B058101. Second Dist., Div. Two. Dec. 1, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH ECHEVARRIA, Defendant and Appellant.

▮▮▮▮▮▮

▮▮▮▮▮

**COUNSEL**

Marilyn S. White-Redmond, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, and David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**LORD, J.*—**

*Statement of the Case*

Appellant was charged with one count of murder, a violation of Penal Code section 187. It was further alleged that the offense was committed with the use of a firearm within the meaning of Penal Code sections 1203.06, subdivision (a) and 12022.5. After a jury trial, appellant was found guilty of second degree murder and the use of a firearm allegation was found to be true.

*Statement of Facts*

Appellant and Ms. Milligan had an ongoing relationship, that was either intimate (Ms. Milligan's version) or more like a big brother (Ms. Palmetto's version). (Ms. Palmetto is apparently appellant's common law wife; see *post.*) During the course of this relationship Ms. Milligan met the victim. The victim told Ms. Milligan that he was in the movie industry. He indicated that he did the latex and makeup work on movies and that he could get her some work as an extra. Ms. Milligan, thereafter, met with the victim at his hotel room and posed for some photographs. Some of the photographs were taken of Ms. Milligan after the victim had applied latex to her semiclothed body.

Later in the month of June 1989, Ms. Milligan, at the request of the victim, returned to the victim's hotel room with her two younger sisters for

*Judge of the Municipal Court for the Downey Judicial District sitting under assignment by the Chairperson of the Judicial Council.

more photographs. During this session, Ms. Milligan's younger sisters were videotaped after latex had been applied to their bodies, and during portions of the videotape, the minors were nude. Ms. Milligan was also videotaped by the victim while she did some sort of "screen test" with a male friend of hers. She took her clothes off as part of this "screen test." Although Ms. Milligan did not tell appellant about the videotape, she did tell a couple of other friends about it and she explained to them that she had been nude during the taping. Thereafter, appellant became aware of the tape and told Ms. Milligan that he wanted to see the tape and wanted to know what she had done.

On the night of June 27, 1989, appellant, in the company of Ms. Milligan, set out to retrieve this tape. The first attempt was unsuccessful at which time appellant said he "should have brought a gun" and then drove back to Desoto Gardens. By the time they arrived, Ms. Milligan, according to her version of the events, was scared and thought appellant "was up to something that was just no good." Ms. Milligan testified that she did not want to go back to the hotel but she was threatened by appellant who had put a gun to her head and also said he would kill her mother and sisters. Ms. Milligan said appellant tried to force her out of the car once they returned to the victim's hotel but he was not successful, so appellant entered alone. Appellant returned a short time later and told Ms. Milligan that the victim wanted to talk to her. Ms. Milligan then accompanied appellant to the victim's hotel room.

Once in the room, appellant argued with the victim over the return of the videotape. The argument was somewhat vitriolic. Ms. Milligan testified that she was crying throughout this altercation. The victim refused to give appellant the tape because other people were on it. At one point appellant pulled out a gun and pointed it at the victim. Things then calmed down briefly and there was some conversation about appellant getting some food. The victim got some money from his closet and Ms. Milligan gave appellant some money she had. Appellant was apparently near the door when he suddenly shot the victim several times, killing him.

After the shooting, according to Ms. Milligan, appellant told her to lie to the police if questioned. When she was contacted by the police she did, in fact, initially lie to them, but then she told them the truth because in her words, "I can't lie."

Ms. Milligan testified at trial under a grant of immunity related to "any crimes against the minor children [her sisters] occurring during the month of June, 1989, . . . and . . . any actions by the witness that aided defendant in avoiding arrest for the murder . . . ." The immunity was apparently intended to cover any criminal liability of Ms. Milligan for allowing her

sisters to be photographed in the nude, and to cover her initial false story to the police. She specifically was not given immunity for the murder itself. Appellant did not testify.

## Discussion

### I

■ Appellant urges that the conviction must be reversed because the trial court refused to instruct the jury to view the immunized testimony of Ms. Milligan with distrust. The instruction requested by appellant read: "The testimony of a witness who provides evidence against a defendant for immunity from punishment should be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony. However, you must assess the testimony of an immunized witness with caution because of the considerable interest such a witness has in testifying in a manner which is acceptable to the prosecutor." This instruction is wrong and was properly refused. There is no requirement to view immunized testimony with distrust, as this opinion explains, and the second part of the instruction which tells the jury to use caution because of the interest the witness has in testifying in a manner which is acceptable to the prosecutor is misleading because it erroneously suggests that the prosecutor is interested in presenting testimony which is false. The only "manner" in which a witness testifies that should be acceptable to a prosecutor in a criminal case, is in a truthful manner.

As authority for the position that immunized testimony should be viewed with distrust, appellant cites three cases. First there is the case of *People* v. *Pitts* (1990) 223 Cal.App.3d 606 [273 Cal.Rptr. 757], in which the court said: "Although the trial court was under no sua sponte duty to give cautionary instructions regarding the testimony of informers, drug addicts, or immunized witnesses, appropriate instructions should have been given upon request." (*Id.* at p. 881.) The apparent request in that case was that the testimony of immunized witnesses "was to be examined with greater caution than testimony of a normal witness." (*Id.* at p. 880.) Second, there is the case of *People* v. *Leach* (1985) 41 Cal.3d 92, 106 [221 Cal.Rptr. 826, 710 P.2d 893], in which the Supreme Court summarily rejected the idea that an instruction to view immunized testimony with distrust should be given sua sponte. The case does not address whether the instruction should be given if requested. Finally, there is the case of *People* v. *Harvey* (1984) 163 Cal.App.3d 90 [208 Cal.Rptr. 910], in which the issue before the court on appeal was, again, whether an instruction to view immunized testimony with distrust should have been given sua sponte. That court ruled that it need not be given sua sponte but then went on to say that if the request had been made, the defendant would have been entitled to it.

Setting aside the rule that a "case is not authority for an issue not raised by its facts" (*Ziller Electronics Lab GmbH* v. *Superior Court* (1988) 206 Cal.App.3d 1222, 1230 [254 Cal.Rptr. 410]), the court in *Harvey* ruled that the "suggested instruction would merely have amplified CALJIC No. 2.20 by pointing out to the jury the specific bias and self-interest which motivated [the immunized witness's] testimony." (*People* v. *Harvey, supra,* 163 Cal.App.3d at p. 113.)

In this case, the court did amplify CALJIC No. 2.20 by adding the following language to that instruction: "Whether the witness is testifying under a grant of immunity." The trial court's decision to give this instruction rather than the proffered defense instruction was correct.

In the first place, unlike *Harvey* where the immunized witness was given immunity as to the same murder charge pending against the defendant, Ms. Milligan was specifically not given immunity as to the murder. The immunity she was given related to events which took place before the murder, involving her sisters, and for events which took place after the murder, involving the cover-up story for appellant. There is nothing to suggest that, in the absence of the grant of immunity, Ms. Milligan's testimony regarding the murder itself would be any different, because she was not given immunity as to the murder. In the second place, assuming, arguendo, that the grant of immunity could have had a significant effect on the accuracy of Ms. Milligan's testimony, the trial court's decision would still be correct. Appellant points out, as does the court in *Harvey,* the logic behind the concept that an immunized witness's testimony may not be as trustworthy as a nonimmunized witness's testimony. It is equally logical that a convicted felon's testimony may not be as trustworthy as a nonfelon's, or that a person with an established bias, interest, or other motive, may not be as trustworthy as someone without such interests or motives. All of these factors are "amplified" within CALJIC No. 2.20, and this trial court's inclusion of an immunized witness's testimony in that list of amplifications was entirely appropriate. (See also *People* v. *Hunter* (1989) 49 Cal.3d 957, 976-978 [264 Cal.Rptr. 367, 782 P.2d 608].) Finally, it is a better practice to include factors such as immunized testimony to the list of considerations contained in CALJIC No. 2.20 rather than telling the jurors which witnesses they should or should not trust because, as they are specifically instructed, they "are the sole judges of the believability of a witness and the weight to be given the testimony of each witness." (CALJIC No. 2.20.) (See also Evid. Code, § 312 and Pen. Code, § 1127.)

Appellant further argues, in support of the contention that the trial court should have instructed the jury to view an immunized witness's testimony

with distrust, that Milligan's "status as an accomplice was clear." If appellant is right then presumably the jury reached this same factual conclusion. ██ ██ The jury was instructed pursuant to CALJIC No. 3.18 which states in part, "The testimony of an accomplice ought to be viewed with distrust."[1] If the case was, in fact, what appellant argues that it was, then he effectively received the instruction that the jury should view Ms. Milligan's testimony with distrust.

## II

██ Appellant next argues that the conviction must be reversed because the trial court gave the jury CALJIC No. 2.06, which deals with a defendant's attempt to supress evidence. Appellant argues that No. 2.06 is an improper pinpoint instruction. (*People v. Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049].) Although the Fourth District in *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285 [3 Cal.Rptr.2d 808], rejected a challenge to CALJIC No. 2.06 based on the same *People v. Wright* principles being advanced by appellant, the appellant contends that *Fitzpatrick* was wrongly decided. The decision in *Fitzpatrick* was correct and we will follow it.

In this case the appellant had a distinctive beard and moustache at the time of the murder. After the murder, appellant shaved off the beard and moustache and cut his hair. A desk clerk saw appellant several times on the night of the murder. He was able to identify appellant from a photo lineup. In the photo lineup appellant had the distinctive beard and moustache. At trial, after the appellant changed his appearance, this desk clerk was unable to recognize him. The clerk did recognize Ms. Milligan as defendant's companion on the night of the murder despite the fact that he had seen her fewer times than appellant. In a similar case, the court approved of the use of CALJIC No. 2.06 in a situation where a defendant refused to participate in a lineup and thereafter cut his hair and shaved off his moustache. (*People v. Huston* (1989) 210 Cal.App.3d 192 [258 Cal.Rptr. 393].) Appellant's attempt to distinguish *Huston* from the facts in this case is unpersuasive.

There was no error in giving CALJIC Instruction No. 2.06.

---

[1]Although this instruction begins with similar language, that is, that the jurors should start from a position in which they disbelieve a witness ("ought to be viewed with distrust"), this instruction had, at its roots, a statutory requirement that it be given (Code Civ. Proc., § 2061 [repealed by Stats. 1965]). Also, accomplice testimony is not entitled to the same full credit for the proof of a fact without additional evidence (Evid. Code, § 411; Pen. Code, § 1111; *People v. Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126]), but immunized testimony is entitled to such credit (*People v. Hunter, supra,* 49 Cal.3d 957.) The continued viability of this language, in light of the repeal of its initial statutory basis, is not an issue in this case, nor is there any need to review it for the purposes of this decision.

## III

■ Appellant's final contention on appeal is that the prosecuting attorney committed *Griffin* error *(Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) In her summation the prosecuting attorney said: "What was Joseph Echevarria doing at Desoto Gardens from between 9.00 p.m. June 27, 1989, to the early morning hours of June 28, 1989? Isn't it amazing that the only people who can tell you that are Christina [Milligan] and Mr. Ahir [the hotel desk clerk]. You had a lot of defense witnesses in here and not one of them can tell you where Joseph Echevarria was that night."

This is not *Griffin* error. It should be noted at the outset that Desoto Gardens is in Canoga Park which is miles away from the hotel in Hollywood where the murder took place. The prosecutor's statement would be understood by any juror as a comment on the failure by the defense to produce an alibi witness for the crucial period. This type of comment has specifically been found not to be *Griffin* error. *(People* v. *Szeto* (1981) 29 Cal.3d 20 [171 Cal.Rptr. 652, 623 P.2d 213].) Appellant called several defense witnesses. One such witness was Ms. Palmetto. Ms. Palmetto described herself as appellant's "partner." Appellant's mother and another defense witness described her as appellant's wife. June 27, 1989, was appellant's birthday. Ms. Palmetto testified that she saw him that evening at approximately 9 p.m. She did not see him again until the early morning hours of June 28, when she picked him up in Desoto Gardens. The murder took place during this time. No defense witnesses testified that they saw appellant at Desoto Gardens (or any other place) during this time frame. Under the circumstances present in this case, the prosecutor's argument was not a direct or indirect comment on appellant's failure to testify. The fact that the trial court, upon a defense objection, said that the comment was "close" to *Griffin* error does not change this result. Any time a prosecutor chooses to comment on some perceived failure of evidence by the defense in a case in which the defendant has chosen not to testify, the prosecutor will be "close" to *Griffin* error. It is a path fraught with peril and generally ill-advised, but it is not forbidden. (See also *People* v. *Ratliff* (1986) 41 Cal.3d 675 [224 Cal.Rptr. 705, 715 P.2d 665] and *People* v. *Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047].)

## IV

Appellant, in propria persona, submitted an additional brief to this court. In his brief the appellant claims that (1) he was denied effective assistance of counsel; (2) he was prejudiced when the prosecutor excused a defense

witness; (3) his photo lineup was unduly suggestive; (4) the desk clerk misidentified him; (5) CALJIC No. 2.71.7 should have been given; and (6) he wanted to testify at trial.

1. ■ To prevail on this claim, appellant must show that counsel's representation fell below an objective standard of resonableness under prevailing professional norms. (*People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839].) A review of the record demonstrates that appellant's trial counsel was clearly competent and her effectiveness is readily ascertainable by the fact that, despite an abundance of evidence that appellant actually committed murder in the first degree, trial counsel obtained an acquittal on that charge so that appellant only stands convicted of second degree murder.

2. ■ The record shows that a witness named Mr. Bing was excused by the prosecutor at appellant's preliminary hearing on December 20, 1989. It was conceded by appellant that this action was inadvertent. A body attachment was issued at that time. Mr. Bing had not been located by the time of appellant's trial in January 1991. Appellant does not indicate how Mr. Bing's testimony would have assisted his defense. At trial, the court asked if anything needed to be done in regards to Mr. Bing and appellant said no. Appellant cannot claim error now.

3. A motion regarding the suggestiveness of the photo lineup was made at the preliminary hearing and again at trial. Both bench officers hearing the motion found that the lineup was not unduly suggestive. We have independently reviewed the lineup and we also find that it is not unduly suggestive.

4. ■ In a jury trial all questions of fact are to be decided by the jury. (Evid. Code, § 312.) If their finding is supported by substantial evidence it will not be disturbed. ■ "[T]he claimed weaknesses of identification testimony are a matter of argument to the trier of fact and cannot properly be directed to this court or effectively urged on appeal." (*People* v. *Johnson* (1960) 187 Cal.App.2d 116, 122 [9 Cal.Rptr. 571].) There is substantial evidence to support the identification of appellant as the perpetrator in this case.

5. ■ In regards to CALJIC No. 2.71.7, relating to preoffense statements by a defendant, the prosecutor requested this instruction and appellant objected to its inclusion, expressly stating the reason was trial strategy, because of a concern that it would lend credence to the evidence that such a statement was made. There is no error in the trial court's acquiescence to the defense strategy of not instructing the jury pursuant to CALJIC No. 2.71.7.

6. ■ As regards appellant's claimed desire to testify, the only record relating to this is the following discussion with the trial court out of the jury's presence, after the defense had rested:

"THE COURT: Mr. Echevarria, I need to make an inquiry of you personally, sir.

"Do you understand at this point with your side resting, you are not testifying. You have a right to testify even over the objections of your attorney, that is your right.

"THE DEFENDANT: Yes.

"THE COURT: If you ever appeal or make some claim that your attorney told you not to and you didn't know you could, we try to eliminate that. Do you understand you do have a right to testify?

"THE DEFENDANT: Yes, I do.

"THE COURT: You talked to your attorney about that right to testify?

"THE DEFENDANT: Yes.

"THE COURT: It's your decision not to, is that correct?

"THE DEFENDANT: Yes, it is."

Appellant's claim as to a concealed desire to testify which is in direct contradiction to his express declaration in open court is completely unavailing.

### Disposition

The judgment is affirmed.

Fukuto, Acting P. J., and Nott, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 17, 1993.