[No. B120730. Second Dist., Div. Four. July 20, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES HAMPTON et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. Portions deleted are the sections entitled "Conduct Credits" and "Parole Revocation Fine."

**COUNSEL**

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Charles Hampton.

Martin Kassman, under appointment by the Court of Appeal, for Defendant and Appellant Darrell Williams.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar and Audree S. Wong, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

Appellant Charles Hampton robbed a Burger King restaurant; appellant Darrell Williams drove the getaway car. Tried jointly, they were both convicted by a jury of robbery, with findings as to Hampton that he personally used a firearm, and as to Williams that a principal was armed with a firearm.

The court admitted into evidence Hampton's custodial confession to police concerning his commission of the robbery, with instructions to the jury that it was not admissible against Williams. Hampton's confession was carefully edited to omit any mention of Williams or of Williams's participation. We conclude the editing was sufficient to prevent Hampton's confession from powerfully implicating Williams. Therefore its admission into evidence with a limiting instruction did not violate Williams's federal constitutional right to confront witnesses against him. We also find no error in the trial court's instruction on credibility of an immunized witness or the trial court's award of presentence conduct credits as to Hampton. We affirm

the judgments after modifying them to include a mandatory parole revocation fine.

## Factual and Procedural Background

### *Testimony of Eyewitnesses*

The circumstances of the robbery were proved through the testimony of three of the restaurant employees, followed by evidence of Hampton's confession admitted solely against him. One of the employees was, at the time of the robbery, Williams's girlfriend; she testified at trial under a grant of immunity from the prosecutor.

The robbery occurred about 11:00 p.m. on April 27, 1997, at a Burger King restaurant on North Lake Avenue in Pasadena. The dining area was closed about 10:00 p.m., and employee Hope Ritter was cleaning it. Ritter was then appellant Williams's girlfriend. She was acquainted with appellant Hampton, who was a friend of Williams, and with Donna Statten, another friend of Williams. Earlier that evening Ritter requested Williams to pick her up and give her a ride home, telling him she would get off work at 11:00. While she was cleaning, Ritter observed the flash of headlights from "the car." Williams regularly picked up Ritter at work, and this was a signal they had worked out to indicate his arrival.

Donna Statten came to the locked door and asked if she could come in while Ritter finished cleaning. Ritter asked and received permission from the manager, Keith Clark, to admit Statten. Ten to fifteen minutes later, Statten informed Ritter that Williams was at the door. Through the door Williams asked Ritter who was closing that night; she told him "Keith" was closing. About five minutes later, Williams came to the door again, this time accompanied by Hampton. Williams again (or perhaps Hampton) asked who was closing that night. Ritter said, "Keith. Why?" At trial Ritter did not remember any response to her question. Ritter asked Donna Statten what was going on, but Statten just shrugged.

After about five more minutes of work, Ritter was finished. She clocked out and exited the door with Statten walking behind her. Suddenly she saw Hampton coming toward her. Hampton "pulled down a beanie," and he had a gun in his hand. He ran into the restaurant while the door was open. Williams was not "with" Hampton at the door, but he was outside. Williams grabbed Ritter's arm and said, "Let's go."

Restaurant manager Keith Clark saw a man wearing a ski mask enter the restaurant. The robber pointed a gun at Clark's head and demanded money.

Clark retrieved money from the cash registers, put in it a Burger King paper bag, and turned it over. Clark then lay on the floor as the robber demanded. He heard the robber leave. Another employee, Carlos Hicks, who was in the kitchen area, observed the robbery. When the robber left, Hicks chased him.

After Williams grabbed Ritter's arm outside the restaurant, he and Ritter and Statten got in the car. Ritter said, "Why are you guys doin' this to me? . . . You fucked up my life." All Williams said in reply was, "It's gonna be okay." Williams drove the car out of the parking area onto the street by the nearby McDonald's, and pulled over on the street. Williams then got out of the driver's seat and opened up the left rear passenger door. According to Ritter, the car was a blue four-door. Ritter then observed Hampton running to the car. Hampton was carrying a bag. As he neared the car Hampton dropped some change on the ground. Williams and Hampton picked up the money, then Hampton got in and Williams drove off.

Meanwhile employee Hicks was chasing the robber. As the robber ran toward the car parked across the street from McDonald's, the driver got out and pushed the passenger seat forward. According to Hicks the car was a primer-gray two-door. Suddenly the robber and driver were on the ground as if picking up something. Then they got in the car and it was driven away.

Ritter testified that after they drove away they went to her apartment. She saw the gun there. She got no money from the robbery, and had no knowledge if or how it was split among Williams, Hampton, or Statten. She and Williams returned to the Burger King that night. She spoke to police there and lied that she did not know the robber. Two days later the police came to her apartment and requested consent to search, which she gave. During that search police found a wallet which Ritter had long ago stolen and used the owner's name and credit to get telephone service. She was arrested for the wallet theft and fraud. When interviewed she was also told she was a suspect in this robbery. Scared, she then told the police the truth about the robbery, consistent with her testimony at trial.

Ritter was prosecuted by the Pasadena City Attorney (i.e., for a misdemeanor) in connection with the wallet and telephone service case. She was not given immunity for that case. About a week before the trial of the present case the deputy district attorney granted her immunity to testify in this case. Ritter understood it to mean that she could not be prosecuted for whatever she might say in court or for any of these events. But she was not concerned, because, "I'm not involved in this." She agreed to testify in this case before she was granted immunity.

No testimony was offered by the defense.

*Hampton's Confession*

Hampton gave a tape-recorded confession to the police. The interview lasted about an hour and 15 minutes, during the first 45 minutes of which Hampton denied being involved. The record on appeal does not include Hampton's original unedited statement, which apparently contained numerous references to Williams and apparently was 60 pages long when transcribed. The confession was severely edited prior to trial to delete the references to Williams. As edited or redacted and admitted into evidence, the tape was short and its transcription was only five pages long.[1]

As redacted the statement by Hampton contains no reference to Williams, nor does it contain any substituted symbols for an unnamed person who could be Williams, such as "blank" or "name deleted" or "the other guy." It contains no references at all to the driver of the vehicle. The only mention of other persons is that the gun was "[a]t Hope's house" that night after the robbery and "Donna counted" the money "back at Hope's apartment."

But Williams contends the editing was insufficient to avoid a violation of Williams's constitutional right to confront Hampton concerning Hampton's statement, because the following portion remained in the redacted version:

"[Q] Where'd you get the ski mask from?

"[A] In the car.

"[Q] Where in the car?

"[A] In the trunk.

"[Q] Where'd the gun come from?

"[A] The trunk.

"[Q] So, at what point is it in the parking lot you decide to go in and go through with this plan?

"[A] I was sitting in the car, you know, for a while and then, it's like, just go in there when they run out; when they come out."

---

[1]The prosecutor was able to delete portions of the tape recording so as to actually play the edited tape for the jury. The tape was admitted into evidence as exhibit 3A and played for the jury. A five-page transcription of the tape was marked for identification as exhibit 3B and given to the jurors to read along during the playing of the tape, but was not admitted into evidence. The five-page transcription is included in the record on appeal. There is no dispute on appeal as to its accuracy; therefore, we rely on the transcription for the statement's contents.

At the pretrial hearing on redaction of the statement, Williams's counsel argued that this portion incriminated Williams because the other evidence would show that Williams was driving, and inferentially he controlled the keys to open the trunk, therefore the statement strongly suggested that Williams supplied the mask and gun for the robbery. The prosecutor replied that the statement did not suggest that the mask and gun came from or were supplied by Williams. "I think that I've redacted it to such an extent that it's now a place rather than any reference to a person." "I don't think there will be any testimony to indicate that the car belonged to Mr. Williams, [although] he was driving the car that night." The trial court agreed with the prosecutor. To defense counsel's argument that the statement implied Williams was helping, the court responded, "[t]hat's not what it says." The court concluded, "If the evidence is [merely that] Mr. Williams was driving the car and there's no evidence it's Mr. Williams' car, I'm inclined just to leave it [the redacted statement] as is."

After all the eyewitness testimony was in, Williams's counsel requested the trial court to reconsider its ruling "in light of the testimony that we've heard, because I think that it . . . incriminates Mr. Williams." "By Mr. Hampton stating that he got the weapon and the mask from the trunk of the car, I think the jurors could infer, by inference think Mr. Williams had something to do—supplied him with a gun or in this way aided him in getting the mask and the gun from the trunk." The prosecutor replied, "We've already been through this. There's nothing new that I really have to say other than I think we've been very careful in deleting any references to Mr. Williams in this tape. And I think there is no implication that it is Mr. Williams as opposed to somebody else who was present in the car." The trial court overruled Williams's renewed objection.

When the tape of Hampton's statement was subsequently played for the jury, the trial court instructed the jury, "[T]his statement you just heard on tape is being admitted only against Mr. Hampton. Maybe I'll indicate further what's implied. It's not being admitted against Mr. Williams and has no bearing whatsoever on the case against Mr. Williams. You should not consider it at all in deciding the case against Mr. Williams." During final jury instructions this was repeated in the language of CALJIC No. 2.08: "Evidence has been received of a statement made by defendant CHARLES HAMPTON after his arrest. [¶] At the time the evidence of this statement was received you were instructed that it could not be considered by you against the other defendant. [¶] Do not consider the evidence of this statement against the other defendant."

In argument to the jury the prosecutor was careful to avoid using Hampton's statement against Williams. She argued as to Hampton that his confession was ample corroboration of his guilt of the crime, reminding the jury in

the process that this piece of evidence could be used only against Hampton. As to Williams, the prosecutor relied on the circumstances related in Ritter's and Hicks's testimonies: Williams twice came to the door asking who was closing, he was in a position outside the restaurant to observe what Hampton had done, he moved the car to the street opposite McDonald's and waited, then opened the car door for Hampton and helped Hampton pick up the spilled money, and Williams never told Ritter, under circumstances when it would have been appropriate to do so, that he had nothing to do with the robbery.

### ADMISSION OF HAMPTON'S CONFESSION IN JOINT TRIAL

■ Williams had a federal constitutional right to cross-examine the witnesses against him. Williams contends that through introduction of Hampton's confession, even with a limiting instruction, Hampton (who did not take the stand and could not be cross-examined) in effect became a witness against Williams and therefore Williams was denied his federal constitutional right to confront witnesses. "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant. This accords with the almost invariable assumption of the law that jurors follow their instructions." (*Richardson* v. *Marsh* (1987) 481 U.S. 200, 206 [107 S.Ct. 1702, 1707, 95 L.Ed.2d 176].) But in *Bruton* v. *United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476], the Supreme Court "recognized a narrow exception to this principle: We held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." (*Richardson* v. *Marsh, supra,* 481 U.S. at p. 207 [107 S.Ct. at p. 1707].) In *Bruton* the nontestifying codefendant Evans confessed to authorities during his postarrest interrogation that he and Bruton committed the armed robbery together. (391 U.S. at p. 124 [88 S.Ct. at pp. 1621-1622].) The Supreme Court held that in this particular context the risk that a jury would not or could not follow the limiting instruction was "so great, and the consequences of the failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (391 U.S. at p. 135 [88 S.Ct. at p. 1627].) The court concluded that, "[s]uch a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (391 U.S. at pp. 135-136 [88 S.Ct. at pp. 1627-1628].) The Supreme Court cited with approval (391 U.S. at pp. 130-131 [88 S.Ct. at p. 1625]) the California Supreme Court decision in *People* v. *Aranda* (1965) 63 Cal.2d

518 [47 Cal.Rptr. 353, 407 P.2d 265], which reached a similar result on state law grounds. There a codefendant Martinez confessed to police that he and Aranda committed the robbery. (63 Cal.2d at p. 522.) Although the jury was instructed the confession was admitted only against Martinez, the California Supreme Court concluded the jury could not "perform the overwhelming task of considering it in determining the guilt or innocence of the declarant and then of ignoring it in determining the guilt or innocence of any codefendants of the declarant . . . . [The jury] cannot determine that a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore the inevitable conclusion that B has committed those same criminal acts with A." (63 Cal.2d at p. 529.)

*Aranda* held that statements of the nontestifying declarant could be admitted at a joint trial "if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (63 Cal.2d at p. 530.) In *Richardson* v. *Marsh, supra*, 481 U.S. at pages 203, 208 [107 S.Ct. at pages 1705, 1707-1708], the United States Supreme Court approved the principle of permitting introduction in a joint trial of a redacted statement, where deletions eliminated any reference to other persons; but the court limited the redaction method in *Gray* v. *Maryland* (1998) 523 U.S. 185 [118 S.Ct. 1151, 140 L.Ed.2d 294].

We find the present case closer to, and controlled by, *Richardson* v. *Marsh* rather than *Gray* v. *Maryland*. The United States Supreme Court cases rather than *Aranda* govern, because "[t]he question before this court is one of federal constitutional law. To the extent that [the] decision in *People* v. *Aranda, supra*, 63 Cal.2d 518, constitutes a rule governing admissibility of evidence, and to the extent this rule of evidence requires exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d))." (*People* v. *Fletcher* (1996) 13 Cal.4th 451, 465 [53 Cal.Rptr.2d 572, 917 P.2d 187].)

In *Gray* v. *Maryland, supra*, 523 U.S. 185, the codefendant Bell confessed to police that he, the defendant Gray, and a third man named Vanlandingham participated in the beating which led to the victim's death. The prosecution attempted to cure the *Bruton* problem by inserting blanks or "deleted" in place of Gray's name in the accusatory statement by Bell, so that it read, "(Q) Who was in the group that beat Stacey[?] [¶] (A) Me, ['deleted,'] and a few other guys." (523 U.S. at pp. 188-189, 199 [118 S.Ct. at pp. 1153,

1158] [appendix].) The Supreme Court held this was insufficient to avoid violating *Bruton*. "Originally, the codefendant's confession in the case before us, like that in *Bruton*, referred to, and directly implicated another defendant. The State, however, redacted the confession by removing the nonconfessing defendant's name. Nonetheless, unlike Richardson's redacted confession, this confession refers directly to the 'existence' of the nonconfessing defendant. The State has simply replaced the nonconfessing defendant's name with a kind of symbol, namely the word 'deleted' or a blank space set off by commas." (523 U.S. at p. 192 [118 S.Ct. at p. 1155].) The court held this was transparent and ineffective, as any juror would realize that the symbol referred to the defendant Gray. "The blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to Evans' use of Bruton's name . . . ." (523 U.S. at p. 194 [118 S.Ct. at p. 1156].) "[C]onsidered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to Bruton's unredacted confessions as to warrant the same legal results." (523 U.S. at p. 195 [118 S.Ct. at p. 1156].)

The court in *Gray* contrasted the decision in *Richardson* v. *Marsh, supra,* 481 U.S. 200. The defendant Marsh was tried jointly with codefendant Williams for a murder in the course of robbery. Williams confessed after his arrest that he, Marsh, and a third person named Martin were involved. "The confession was redacted to omit all reference to respondent [Marsh]— indeed, to omit all indication that anyone other than Martin and Williams participated in the crime." (481 U.S. at p. 203 [107 S.Ct. at p. 1705], italics omitted.) As redacted, the Williams confession indicated that he and Martin discussed the robbery on the way to the scene in a car. During the defense case, defendant Marsh testified to having been in the car with Williams and Martin but denied having heard their conversation. The jury was instructed, and the prosecutor reminded the jury, not to consider Williams's statement against Marsh. The Supreme Court distinguished *Bruton* and held Marsh was not denied her constitutional right to confrontation. The court said that *Bruton* was "a narrow exception" to the general principle that jurors are presumed to follow instructions. (481 U.S. at p. 207 [107 S.Ct. at p. 1707].) "There is an important distinction between this case and *Bruton*, which causes it to fall outside the narrow exception we have created. In *Bruton*, the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice. . . . Thus, at the time that confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating.' . . . By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony). [¶] Where the necessity of such linkage is

involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination . . . . [W]ith regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule." (*Id.* at p. 208 [107 S.Ct. at pp. 1707-1708], citations and fn. omitted.)

The present case is very similar to *Richardson* v. *Marsh* and not at all like *Gray* v. *Maryland.* As redacted, Hampton's confession nowhere states that he participated in the robbery with any other person. It mentions only "Donna" and "Hope" by name, and only in connection with events after the robbery. It does not mention any other person being in control of the car. It mentions only himself as taking the gun and mask from the car trunk. Hampton's redacted confession does not on its face incriminate Williams as a participant, either by name or by obvious substitution as in *Gray.* The conclusion that Williams was involved with the taking of the gun and mask from the car trunk requires *inference* from the statement itself and linkage with other evidence, the testimony of Ritter concerning Williams's arrival by car to pick her up from work and Williams's driving of the car afterward. This is not a "powerfully incriminating," "expressly implicat[ing]" codefendant confession which, under the narrow *Bruton* exception, a jury cannot ignore even with a limiting instruction. It is instead an indirect and less vivid implication as to Williams which, under *Richardson* v. *Marsh,* the jury can be presumed to have ignored in light of the instructions and argument that Hampton's statement was admitted only against Hampton and may not be considered against Williams. (*Richardson* v. *Marsh, supra,* 481 U.S. at p. 208 [107 S.Ct. at pp. 1707-1708]; *People* v. *Bryden* (1998) 63 Cal.App.4th 159, 174, 176 [73 Cal.Rptr.2d 554] [letter by codefendant Bryden was redacted to excise any statements directly implicating defendant Padin; Padin's argument that the statements nevertheless implicated him was rejected; the only incriminating inference was to bolster the credibility of a third participant Vandevort who testified under immunity; this potential impact "was indirect; the jury had to use inference to connect statements in this redacted [letter] with Padin"; *Richardson* v. *Marsh* rather than *Gray* v. *Maryland* held controlling].)

This case is so similar to *Richardson* v. *Marsh* that it is clear the United States Supreme Court would hold that Williams's federal constitutional right

to confront witnesses was not violated by the admission into evidence of Hampton's redacted confession with a limiting instruction that it was not to be considered against Williams.[2] Therefore, the trial court did not err in admitting the evidence, since under California Constitution, article I, section 28, subdivision (d) it could not be excluded. (*People* v. *Fletcher, supra,* 13 Cal.4th at p. 465.)

### JURY INSTRUCTION AS TO IMMUNIZED WITNESS

■ Williams's trial counsel requested the court to instruct the jury that the testimony of a witness who has been granted immunity should be viewed "with distrust," by adapting former CALJIC No. 3.18, which stated such rule concerning *accomplice* testimony.[3]

The trial court refused Williams's request and instead gave a modified version of CALJIC No. 2.20, the general instruction on factors to consider in determining the believability of a witness, to include, "Whether the witness is testifying under a grant of immunity." The court concluded CALJIC No. 2.20 was "the appropriate place to raise that subject in the instructions."

The trial court was correct. (*People* v. *Hunter* (1989) 49 Cal.3d 957, 976-978 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Echevarria* (1992) 11 Cal.App.4th 444, 449-451 [13 Cal.Rptr.2d 840].)

---

[2]The recent decision in *Lilly* v. *Virginia* (1999) 527 U.S. 116 [119 S.Ct. 1887, 144 L.Ed.2d 117] also provides no aid to Williams. In the present case the trial court recognized that Hampton's original statement was not admissible against Williams. The court cured the *Bruton* problem by redacting the statement so that it did not directly implicate Williams, and by giving a limiting instruction. In *Lilly*, on the other hand, the trial court admitted the codefendant's confession in its entirety with no limiting instruction. The Virginia court opined the declarant's statement was fully admissible against both defendants because it met a hearsay exception as a declaration against the declarant's penal interest. The United States Supreme Court rejected that position but distinguished the different problem posed by the present case, which is the adequacy of redaction and a limiting instruction to prevent the statement's use against the nondeclarant. "In the years since *Bruton* was decided, we have reviewed a number of cases in which one defendant's confession has been introduced into evidence in a joint trial pursuant to instructions that it could be used against him but not against his codefendant. Despite frequent disagreement over matters such as the adequacy of the trial judge's instructions, or the sufficiency of the redaction of ambiguous references to the declarant's accomplice, we have consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person." (*Lilly* v. *Virginia, supra,* 527 U.S. at p. ___ [119 S.Ct. at p. 1896].)

[3]Pursuant to the suggestion of the California Supreme Court in *People* v. *Guiuan* (1998) 18 Cal.4th 558, 569, footnote 4 [76 Cal.Rptr.2d 239, 957 P.2d 928], CALJIC No. 3.18 was modified in 1999 to state, "To the extent that an accomplice gives testimony that tends to incriminate a defendant, it should be viewed with caution."

Williams does not contend that Hope Ritter was an accomplice; there is no substantial evidence that she was a knowing aider and abettor of the robbery. (Pen. Code, § 1111 [accomplice is one who is liable to prosecution for the identical offense charged against the defendant].) Williams contends, however, that a witness who has been granted immunity has such a strong motive to testify in the manner the prosecutor expects, that the jury should be instructed to view such testimony with distrust.

There is no merit to this contention. The instruction that *accomplice* testimony should be viewed with distrust was required by *statute*, former section 2061 of the Code of Civil Procedure. Although the statute was repealed in 1965 with an operative date of January 1, 1967, its requirement was retained at common law at the recommendation of the California Law Revision Commission. (*People* v. *Guiuan, supra*, 18 Cal.4th at p. 567; *People* v. *Echevarria, supra*, 11 Cal.App.4th at p. 451, fn. 1.) No statute requires that nonaccomplice testimony of an immunized witness be viewed with distrust. (See *People* v. *Garceau* (1993) 6 Cal.4th 140, 191, fn. 21 [24 Cal.Rptr.2d 664, 862 P.2d 664] [contrasting Penal Code section 1127a, subdivision (b), which now requires the jury be instructed, upon request, that " '[t]estimony of an in-custody informant should be viewed with caution and close scrutiny' "].) On the contrary, the legislative general rule, Evidence Code section 411, provides that "[e]xcept where additional evidence is required by statute [e.g., Penal Code section 1111 requiring corroboration of an accomplice's testimony], the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." Whether the testimony of even an "interested" witness should be given full credit is a question of fact exclusively for the jury. That is a strong reason why the cases have held that the fact a witness was given immunity is appropriately placed in CALJIC No. 2.20. (*People* v. *Harvey* (1984) 163 Cal.App.3d 90, 113 [208 Cal.Rptr. 910]; *People* v. *Echevarria, supra*, 11 Cal.App.4th at pp. 450, 451, fn. 1.)

Although *People* v. *Hunter, supra*, 49 Cal.3d at pages 976-978, is a California Supreme Court case on point, Williams contends it should no longer be followed. He points to that portion of *Hunter* wherein the California Supreme Court declined to adopt a rule developed by federal trial courts that "a defendant is entitled on request to an instruction that the testimony of informers, accomplices and immunized witnesses should be viewed with suspicion." (*Id.* at pp. 977-978.) Williams contends that the California Supreme Court declined to follow the federal practice *because* a federal prosecutor "cannot grant transactional immunity," and thus remains free to prosecute the witness so long as the prosecution was not based on the witness's testimony, whereas under then California law immunity was

"transactional," therefore the prosecutor's leverage was sharply diminished. Williams contends this rationale for distinguishing the federal practice has since been undermined by amendment of Penal Code section 1324 in 1996. Under the amended statute a California prosecutor may now provide either "use" or "transactional" immunity. Williams contends that now a witness who has been granted only "use" immunity could still be prosecuted for the transaction based on evidence independent of the testimony, and therefore such a witness has a compelling interest to testify as the prosecutor expects.

The record on appeal does not contain the immunity proceedings and does not explicitly describe what type of immunity was provided to Hope Ritter. The testimony of Ritter, however, implies she was granted both types. On cross-examination she stated her understanding of the immunity was "[the People] can't prosecute me for anything I say in court" and "[I'm] not going to be prosecuted for anything connected with this series of events." Williams fails to show that his argument on appeal even applies to the present case.

But even if one of the reasons given in *Hunter* for declining to follow federal practice has been undermined by subsequent changes in the immunity statute, that is not a sufficient ground for us to refuse to follow *Hunter*. There is no requirement that California courts follow the federal court practice, absent any authority that the federal practice is compelled by federal constitutional law. The contrast between the federal and the then California immunity statutes was just one of the reasons offered in *Hunter*. The California Supreme Court also cited Evidence Code section 411 and the principle that a witness's credibility is for the trier of fact (49 Cal.3d at p. 977), and concluded, "The general instruction on witness credibility, coupled with the modified instruction specifically directing the jury to determine whether the immunized witness's credibility had been affected by the grant of immunity, adequately informed the jury of the necessity to weigh the motives of the immunized witnesses." (*Id.* at p. 978.) The California Supreme Court has also declined to adopt the federal practice with respect to informers. (*People* v. *Garceau, supra*, 6 Cal.4th at pp. 190-191.) In *People* v. *Echevarria, supra*, 11 Cal.App.4th at page 450, the Court of Appeal acknowledged ". . . the logic behind the concept that an immunized witness's testimony may not be as trustworthy as a nonimmunized witness's testimony," but still opined: ". . . it is a better practice to include factors such as immunized testimony to the list of considerations contained in CALJIC No. 2.20 rather than telling the jurors which witnesses they should or should not trust because, as they are specifically instructed, they 'are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.' "

Thus, Williams fails to persuade us that the amendment to Penal Code section 1324 would change the California Supreme Court's mind about the

appropriate form of jury instruction on testimony of an immunized witness, and in any event as an intermediate appellate court we are bound in the meantime to adhere to the California Supreme Court's prior opinion. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)[4]

## CONDUCT CREDITS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## PAROLE REVOCATION FINE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are modified to include an additional restitution fine of $200 which shall remain suspended unless and until the defendant violates parole, pursuant to Penal Code section 1202.45. As so modified, the judgments are affirmed. The clerk of the superior court is directed to prepare and send to the Department of Corrections corrected abstracts of judgment reflecting the imposition of a $200 restitution fine pursuant to Penal Code section 1202.4, and an additional suspended $200 restitution fine pursuant to Penal Code section 1202.45.

Hastings, J., and Kuhl, J.,† concurred.

A petition for a rehearing was denied August 18, 1999, and appellants' petition for review by the Supreme Court was denied November 10, 1999.

---

[4]Williams cites *People* v. *Harvey, supra,* 163 Cal.App.3d 90, 112-113, where the Court of Appeal held the trial court had no duty to instruct sua sponte that testimony of an immunized witness should be viewed with distrust, in light of inclusion of immunized testimony in CALJIC No. 2.20, but opined in dictum that "Had Harvey requested such an instruction, there is no question he would have been entitled to it." Although *Harvey* was not cited or expressly disapproved in *Hunter,* it was impliedly disapproved as to such dictum.

*See footnote, *ante,* page 710.

†Judge of the Los Angeles Superior Court, assigned by Chief Justice pursuant to article VI, section 6 of the California Constitution.